**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| MARK ANDERS, <br><br> Plaintiff, <br><br> v. <br><br> CAROLYN W. COLVIN, *in her capacity as Acting Commissioner of the Social Security Administration*, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER** <br><br><br> Case No.  2:14-cv-00610-EJF <br><br><br> Magistrate Judge Evelyn J. Furse |

Plaintiff Mark G. Anders filed this action asking this Court[1] to remand the final agency decision denying his Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, *see* 42 U.S.C. §§ 401–434.  The Administrative Law Judge ("ALJ") determined that Mr. Anders did not qualify as disabled within the meaning of the Social Security Act.  (Admin. R. 18, ECF No. 11, certified copy tr. of R. of admin. proceedings:  Mark Anders (hereinafter "Tr. __").)  Based on the Court's careful consideration of the record, the parties' memoranda, and relevant legal authorities, the Court AFFIRMS the Commissioner's decision.[2]

## I.  PROCEDURAL HISTORY

On April 22, 2009, Mr. Anders filed a Title II application alleging disability beginning June 1, 2007.  (Tr. 120, 126.)  The Regional Commissioner denied Mr. Anders's claims on September 30, 2009, and again upon reconsideration on January 11, 2010.  (Tr. 126.)  Thereafter, Mr. Anders

---

[1] The parties jointly consented to this Court's determination of the case under 28 U.S.C. § 636(c). (ECF No. 18.)

[2] Pursuant to Civil Rule 7-1(f) of the Rules of Practice for the United States District Court for the District of Utah, the Court concludes it does not need oral argument and will determine the appeal on the basis of the written memoranda.

requested a de novo hearing before an ALJ, which occurred on March 3, 2011.  (Tr. 126, 80–117.)
The ALJ issued an unfavorable decision on April 20, 2011, finding Mr. Anders did not qualify as
disabled from June 1, 2007 through April 20, 2011.  (Tr. 123–44.)  Mr. Anders requested the
Appeals Council review the ALJ's decision.  (Tr. 232–33.)  The Appeals Council granted the
request for review, vacated the ALJ's decision, and remanded to the ALJ on June 22, 2012.  (Tr.
145–149.)

        The ALJ conducted a second hearing (the "Hearing") on November 19, 2012.  (Tr. 17, 36–
79.)  Counsel represented Mr. Anders, who testified at the hearing.  (Tr. 36–37.)  Vocational expert
Connie Hill also testified at the Hearing.  (Tr. 37.)  At the Hearing, Mr. Anders amended his
alleged onset date from June 1, 2007 to March 6, 2011.  (Tr. 17, 39–40.)  On December 14, 2012,
the ALJ issued an unfavorable decision (the "Decision") finding that Mr. Anders did not suffer
from a disability on or prior to June 30, 2011.  (Tr. 17–18.)  Mr. Anders again requested that the
Appeals Council review the Decision.  (Tr. 9–13.)  The Appeals Council denied the request for
review on June 27, 2014, (tr. 1–7), making the Decision the Commissioner's final decision for
purposes of judicial review under 42 U.S.C. § 405(g).  *See* 20 C.F.R. § 416.1481 ("The Appeals
Council's decision, or the decision of the [ALJ] if the request for review is denied, is binding
unless you or another party file an action in Federal district court….").  This timely civil action
followed.

## II.  FACTUAL BACKGROUND

        Mr. Anders, born March 6, 1961, has an eleventh grade education and past relevant work
experience as a welder.  (Tr. 28, 69, 273, 317.)

### A.  Medical Evidence

Beginning in 2006, Mr. Anders began treatment for diabetes, back problems, depression, and anxiety by various health providers, including Thomas Marshall, M.D., Brent Jackson, M.D., Russel Jackson, O.D., Alan Smith, M.D., Intermountain Healthcare, and Fillmore Community Hospital.  (Tr. 23.)  An MRI in April 2007 revealed multilevel degenerative disc disease of the cervical spine with mild to moderate neural foraminal narrowing and mild spinal stenosis at C4-5 and C5-6.  (Tr. 23, 499.)  In September 2009, examining physician, Dr. Joseph Nelson, stated that Mr. Anders's diabetes, vision problems, and neuropathy did not limit his ability to work.  (Tr. 23.)  However, Dr. Nelson stated that Mr. Anders's degenerative disk disease did limit his ability to work on uneven surfaces, stand for extended periods, and perform any type of heavy labor.  (Tr. 23–24.)

In April 2010, Dr. Juergen Korbanka completed a psychological evaluation of Mr. Anders.  (Tr. 24.)  Dr. Korbanka diagnosed Mr. Anders with a recurrent, major depressive disorder, anxiety disorder NOS, psychotic disorder NOS, cognitive disorder NOS, and alcohol dependence (provisional).  (Tr. 24.)  Dr. Korbanka reported:

> "[Mr. Anders's] long-term substance abuse and currently untreated diabetes may complicate matters and explain possibly his foot and joint pain.  These symptoms appear to have adversely impacted his overall level of functioning, although his claim for disability primarily lies on medical, rather than psychological, reasoning.  Also, there is some evidence suggestive of psychotic, delusional, and paranoid features, which warrant further evaluation.  Moreover, reports by Mr. Anders, as well as behavioral observations, are suggestive of memory (working memory and long-term memory) problems that merit further psychological testing.  Both his psychotic like symptoms as well as the apparent cognitive impairments may be the long lasting effects of his severe alcohol abuse."

(Tr. 24.)  Dr. Korbanka concluded that, "[f]rom a psychological standpoint, Mr. Anders appears willing and able to work."  (*Id.*)

On October 11, 2010, Mr. Anders's treating physician, Alan Smith, M.D., reported that Mr. Anders, "seemed to be doing well on his current dose of pain medication and that his diabetes was under control without complications." (Tr. 24.) Additionally, Mr. Anders testified, "he felt only a mild degree of depression and was doing well on his medication." (*Id*.) In November 2011, Mr. Anders had a brain CT after reporting blurred vision, headaches, dizziness, and nausea. (Tr. 23.) The CT showed no acute intracranial abnormalities. (*Id*.)

During the administrative proceedings, Mr. Anders testified he became disabled in March 2011, at age 50, from conditions including diabetes and neck and back impairments. (Tr. 17, 22–23, 273.) The ALJ found that the record contained little objective evidence to support Mr. Anders's claims of disability. (Tr. 23, 25–26.) A significant portion of the medical evidence indicated that Mr. Anders did not comply with his medications or diabetes treatment recommendations. (Tr. 24, 26.) Mr. Anders testified he walked with the aid of a cane, but nothing indicated that Mr. Anders needed a cane or that a treating healthcare provider had prescribed one. (Tr. 26.) Moreover, Mr. Anders admits handling his own self-care, preparing simple meals, doing housework, laundry, taking walks, and shopping. (Tr. 22, 25–26.)

Mr. Anders stipulates that the ALJ correctly summarized his medical records and other evidence for steps one through four of the sequential evaluation process. (Pl.'s Opening Br. 7, ECF No. 19.)

## B. *Vocational Evidence*

During the Hearing the ALJ called a vocational expert ("VE") to testify, and Mr. Anders did not object to her qualifications. (Tr. 69.) The ALJ asked the VE to consider a hypothetical individual of Mr. Anders's age, education, and work history who had the Residual Functional Capacity ("RFC") to do a reduced range of unskilled light work with stated limitations. (Tr. 69–

76.)  The VE testified that an individual with this RFC could perform several occupations found in the *Dictionary of Occupation Titles* ("DOT") such as:  (1) gluer, DOT code 795.687-014, light, unskilled, SVP 2, found in approximate numbers of 50,000 in the national economy; (2) cleaner and polisher, DOT code 709.687-010, light, unskilled, SVP 2, found in approximate numbers of 50,000 in the national economy;  and (3) inspector and hand packager, DOT code 559.687-074, light, unskilled, SVP 2, found in the approximate numbers of 50,000 in the national economy.  (Tr. 29–30, 69–70.)

Moreover, the ALJ inquired about any inconsistencies between the VE testimony and the DOT.  (Tr. 30.)  The ALJ inquired about whether the DOT and the *Selected Characteristics of Occupational Titles Defined in the Revised DOT* ("SCO") provided the detail that the ALJ included in his RFC determination, specifically, the "sit/stand option and the other limitations." (Tr. 71.)  The VE responded in the negative.  (*Id*.)  The VE noted that the ALJ's sit/stand option, lifting limitations, and other limitations would significantly affect Mr. Anders's ability to perform unskilled light and sedentary work.  (Tr. 73–74.)  The VE estimated that, for each of the three positions, 50,000 jobs existed in the national economy, which she reduced by eighty percent to account for the hypothetical limitations, leaving 10,000 jobs for each position available to Mr. Anders.  (Tr. 69–70.)  The VE characterized her estimates about the number of available jobs as "conservative" and based on "pretty heavy reductions."  (Tr. 76.)  The VE testified that she relied on occupational data from the *Occupational Employment Statistics Survey* ("OES") and the *Occupational Employment Quarterly* ("OEQ"), along with her professional experience when testifying about the impact of the ALJ's limitations on the number of jobs available.  (Tr. 71–73.)

### C. The ALJ's December 2012 decision

In the present case, the ALJ followed the five-step sequential evaluation for assessing disability claims.  (Tr. 17–30.)  The ALJ found Mr. Anders had the following medically determinable severe impairments:  diabetes mellitus; degenerative disc disease; and degenerative joint disease of the cervical, lumbar, and thoracic spine.  (Tr. 19.)  The ALJ determined Mr. Anders did not have an impairment or combination of impairments that met or medically equaled the "listed" impairments.  (Tr. 20.)

Instead, the ALJ found that Mr. Anders had the RFC to perform a reduced range of unskilled light work in significant numbers in the national economy and did not qualify as disabled under the Act.  (Tr. 29–30.)

### D. Evidence submitted after the ALJ's December 2012 decision

In January 2013, after the ALJ's December 2012 decision, Mr. Anders's counsel sent the ALJ vocational materials to "show that the numbers that [the ALJ] relied upon from the vocational expert are specious and undeserving of significant weight."  (Tr. 428–43.)  Mr. Anders's counsel attached additional vocational materials to the opening brief in this case.  (ECF Nos. 19-2 – 19-7.)

### III.  STANDARD OF REVIEW

42 U.S.C. § 405(g) provides for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA").  The Court reviews the Commissioner's decision to determine whether the record as a whole contains substantial evidence in support of the Commissioner's factual findings and whether the SSA applied the correct legal standards.  42 U.S.C. §§ 405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  The Commissioner's findings shall stand if supported by substantial evidence.  42 U.S.C. §§ 405(g).

Adequate, relevant evidence that a reasonable mind might accept to support a conclusion constitutes substantial evidence, and "[e]vidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).[3]  The standard "requires more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084. "Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotation marks and citations omitted).  Moreover, "[a] finding of 'no substantial evidence' will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (internal quotation marks and citations omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases," the court "will not reweigh the evidence or substitute [its] judgment for the Commissioner's." *Lax*, 489 F.3d at 1084 (internal quotation marks and citations omitted).  The court will "review only the *sufficiency* of the evidence." *Oldham v. Astrue,* 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original).  The court does not have to accept the Commissioner's findings mechanically, but "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met." *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks and citation omitted).  "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence,'" and the court may not "displace the agenc[y's] choice between two fairly conflicting

---

[3] Courts apply the same analysis in determining disability under Title II and Title XVI.  *See House v. Astrue*, 500 F.3d 741, 742 n.2 (8th Cir. 2007).

views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Lax*, 489 F.3d at 1084 (*quoting Zoltanksi v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

In addition to a lack of substantial evidence, the Court may reverse where the Commission uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards. *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Thomson v. Sullivan*; 987 F.2d 1482, 1487 (10th Cir. 1993); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

## IV.  ANALYSIS

The Social Security Act ("Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A).  Moreover, the Act considers an individual disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.*; § 423(d)(2)(A).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-step sequential evaluation. 20 C.F.R. §§ 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750–53 (10th Cir. 1988); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  The analysis evaluates whether:

(1) The claimant presently engages in substantial gainful activity;
(2) The claimant has a medically severe physical or mental impairment or impairments;

(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which preclude substantial gainful activity;

(4) The impairment prevents the claimant from performing his or her past work; and

(5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his or her age, education, and work experience.

20 C.F.R. §§ 404.1520.  The claimant has the initial burden of establishing the disability in the first four steps.  *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989).  At step five, the burden shifts to the Commissioner to show that the claimant retains the ability to perform other work existing in the national economy.  *Id.*

The ALJ evaluated Mr. Anders's claim through step five, making the following findings of fact and conclusion of law with respect to Mr. Anders:

1. "[Mr. Anders] last met the insured status requirements of the Social Security Act on June 30, 2011." (Tr. 19.)

2. "[Mr. Anders] did not engage in substantial gainful activity during the period from his alleged onset date of March 6, 2011 through his date last insured of June 30, 2011 (20 CFR 404.1571 *et seq*.)."  (Tr. 19.)

3. Through the date last insured, [Mr. Anders] had the following severe impairments: diabetes mellitus (e.g. see Ex. 7F, pgs. 9–11) and degenerative disc disease and degenerative joint diseases of the cervical, lumbar and thoracic spine (e.g., see Ex. 1F) (20 CFR 404.1520 (c))."  (Tr. 19.)

4. "Through the date last insured, [Mr. Anders] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526)."  (Tr. 20.)

5. "From the amended alleged onset date through the date last insured, [Mr. Anders] had at least the residual functional capacity to perform the full range of light, unskilled work, but such work could not have required:

   Lifting more than 8.5 pounds at a time, on more than an 'occasional' basis (where 'occasional' means from very little up to 1/3rd of the day);

   Lifting and carrying lighter articles, weighing more than 3 to 5 pounds at a time, on more than an 'occasional' basis;

   Standing or walking more than 15 minutes at one time, nor more than 6 total hours in an 8 hour work day with the option to use a cane;

9

Sitting more than 60 minutes at one time, nor more than 6 total hours in an 8 hour work day;

Note: regarding standing/walking and sitting, to be as comfortable as possible, claimant requires the option to make postural changes as noted above (the 'sit/stand' option), thus there must be an option to perform work duties while standing/walking or sitting;

Bending, twisting or squatting;

Stooping on more than an 'occasional' basis;

Work on the floor (e.g. kneeling, crawling or crouching);

Climbing or descending full flights of stairs (but a few stair steps up or down not precluded);

Overhead lifting or overhead reaching;

More than frequent reaching, frequent handling and frequent fingering, or any duties requiring feeling;

Working around dangerous unprotected heights, machinery or chemicals;

Work at more than a low stress level, which means:

- a low production level (where VE classified all SGA jobs as low, average or high production),
- no working with the general public,
- only occasional contact with supervisors and co-workers on the job, but still having the ability to respond appropriately to supervision, co-workers and typical work situations, and
- the ability to deal with only rare changes in a routine work setting.

Work at more than a low concentration level, which means the ability to be alert and attentive to (and to adequately perform) only unskilled work tasks;

Work at more than low memory level, which means:
- the ability to understand, remember and carry out only 'simple' work instructions (where 'simple' is defined as functioning at GED levels at only- Reasoning: 3 Math: 2 Language: 2),
- the ability to remember and deal with only rare changes in the work instructions from week to week, and
- the ability to remember and use appropriate judgment in making only 'simple' work related decisions.

Further, [Mr. Anders] can perform no work duties involving extended flexion and extension of the neck, no foot controls and no far acuity vision, near acuity vision can be no more than frequent." (Tr. 20–21.)

6.  "Through the date last insured, [Mr. Anders] was unable to perform any past relevant work (20 CFR 404.1565)." (Tr. 28.)

7.  "[Mr. Anders] was born on March 6, 1961 and was 50 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563)." (Tr. 29.)

8.  "[Mr. Anders] has a limited education (11th grade) and is able to communicate in English (20 CFR 404.1564.)" (Tr. 29.)

9.  "Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Mr. Anders] is 'not disabled', whether or not [Mr. Anders] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)." (Tr. 29.)

10. "Through the dated [sic] last insured, considering [Mr. Anders's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [Mr. Anders] could have performed (20 CFR 404.1569 and 404.1569(a))." (Tr. 29.)

11. "[Mr. Anders] was not under a disability, as defined in the Social Security Act, at any time from March 6, 2011, the alleged onset date, through June 30, 2011, the date last insured (20 CFR 404.1520(g))." (Tr. 30.)

In short, the ALJ concluded that Mr. Anders does not possess an impairment or combination of impairments that meets or medically equals one of the listed impairments; he has the RFC to perform unskilled light work with some modifications; and a significant number of jobs exist in the national economy that Mr. Anders can perform given his limitations. (Tr. 19–30.)

Mr. Anders argues the ALJ erred by: (1) improperly determining Mr. Anders's RFC enabled him to perform light work; (2) relying on VE testimony that conflicted with the DOT without reasonable explanation; and (3) relying on VE testimony to conclude that a significant number of unskilled jobs remain available to Mr. Anders, given his exertional and non-exertional limitations. (Pl.'s Opening Br. 14–23, ECF No. 19.)

## A.  RFC Determination and Application of the Grids

Mr. Anders argues that the ALJ erred in finding that Mr. Anders does not qualify as

11

disabled because the ALJ failed to utilize the *Medical-Vocational Guidelines* ("Grids") properly as a framework for decision-making.  (Pl.'s Reply Br. 9–10, ECF No. 29.)  More specifically, Mr. Anders contends that based on the ALJ's RFC determination and the "significant erosion" of the light exertion occupational base, the ALJ had to use a lower Grid rule that would have led to a finding of disability under the Act.  (Pl.'s Reply Br. 10, ECF No. 29.)  The Court disagrees.

The Grids reflect the analysis of various occupational factors including age, education, and work experience in combination with a claimant's RFC to evaluate a claimant's ability to engage in substantial gainful activity other than his past relevant work.  20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a); *Channel v. Heckler*, 747 F.2d 577, 578 (10th Cir. 1984).  An ALJ may rely on the Grids to determine whether a claimant has the RFC to perform alternative work in the national economy in certain circumstances.  20 C.F.R § 404.1520; Williams, 844 F.2d at 751 (citing 20 C.F.R., pt. 404, Subpt. P, App. 2).

Since the Grids do not consider non-exertional limitations, "the grids cannot be applied conclusively if a claimant has nonexertional limitations that significantly limit his 'ability to perform the full range of work in a particular RFC' category."  *Williams*, 844 F.2d at 752 (citing *Teter v. Heckler*, 775 F.2d 1104, 1105 (10th Cir. 1985); *Channel*, 747 F.2d at 579); *see also Trimiar*, 966 F.2d at 1332 (finding exclusive reliance on the Grids proper only if claimant's characteristics precisely match the criteria of the particular Grid rule).  Similarly, the Grids only provide a definitive answer as to whether a claimant qualifies as disabled when the claimant's vocational factors and RFC "coincide with all of the criteria of a particular rule."  20 C.F.R. Pt. 404, Subpt. App. 2 § 200.00(a).  Thus, a claimant's exertional limitations may also prohibit reliance on the Grids when the exertional limitations of the claimant do not match the exertional limitations of any Grid rule.  *Trimiar*, 966 F.2d at 1332–33.

When the ALJ cannot rely on the Grids, ALJs "must give 'full consideration' to 'all the relevant facts,' including [VE] testimony."  *Channel*, 747 F.2d at 583 ((internal citation omitted) citing *Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983);  *Gagnon v. Sec'y of Health & Human Servs.,* 666 F.2d 662, 666 (1st Cir. 1981));  *see also Ragland v. Shalala*, 992 F.2d 1056, 1058 (10th Cir. 1993) (explaining that ALJs must "produc[e] expert vocational testimony or other similar evidence to establish the existence of significant work within [the claimant's] capabilities.") Similarly, the Regulations direct that where a claimant can only perform a limited range of work, the SSA recommends consulting VE testimony.  SSR 83-12, 1983 WL 31253, at *2–3.

Because Mr. Anders had both non-exertional limitations and exertional limitations not matching any particular Grid rule, the ALJ consulted a VE.  (Tr. 20–21, 29, 71.)  The VE agreed that Mr. Anders's exertional and nonexertional limitations reduced his ability to perform a wide range of unskilled light work.  (Tr. 73–74.)  The VE testified that Mr. Anders's limited RFC created a "significant reduction" in his ability to perform the full range of unskilled light work.  (Tr. 73-74.)  Because Mr. Anders could not perform a full range of light or sedentary work, the ALJ could not rely on the Grids conclusively to sustain his burden at step five.  Because Mr. Anders's abilities do not fall neatly within the Grids, the ALJ correctly consulted a VE to assist in determining the types of jobs available to Mr. Anders.  Consequently, the ALJ applied the law regarding the Grids correctly.

### B.  Vocational Expert Testimony

Mr. Anders argues that substantial evidence does not support the ALJ's step-five determination because the ALJ relied on VE testimony that deviated from the DOT, and its companion publications, without reasonable explanation.  (Pl.'s Opening Br. 14, ECF No. 19;  Pl.'s Reply Br. 2–3, ECF No. 29.)  The ALJ's explanation, Mr. Anders contends, failed to provide any

basis for deviating from the DOT, and its companion publications, concerning the visual, educational, and exertional job requirements for the identified jobs of cleaner and polisher, gluer, and inspector/ hand packager.  (Pl.'s Opening Br. 14–17, ECF No. 19.)

    1. *Visual Requirements*

    First, Mr. Anders argues the ALJ erred by relying on VE testimony to determine that Mr. Anders could perform the job of cleaner and polisher because this job requires constant near acuity, something Mr. Anders does not have, as acknowledged by the ALJ's RFC determination. (Pl.'s Opening Br. 14, ECF No. 19.)  This alleged conflict, Mr. Anders argues, required the ALJ to address and resolve the conflict between the DOT and VE testimony.  (*Id*.)  Thus, the ALJ's explanation, Mr. Anders contends, failed to "adduce any basis for deviating from the DOT and SCO concerning the need for constant near acuity for the occupation of a cleaner and polisher," contrary to the Tenth Circuit's ruling in *Haddock v. Apfel*, and SSR 00-4p, 2000 WL 1898704. (*Id*. at 14–15, ECF No. 19 (citing *Haddock*, 196 F.3d 1084, 1089–92 (10th Cir. 1999); SSR 00-4p).)

    An ALJ may rely on VE testimony to determine what jobs a claimant can perform, given the RFC the ALJ posits.  *Gay v. Sullivan*, 986 F.2d 1336, 1341 (10th Cir. 1993).  VE testimony that includes information not listed in the DOT does not necessarily conflict with the DOT but instead may "provide more specific information about jobs or occupations than the DOT."  SSR 00-4p, at *3.

    Neither the DOT nor VE testimony "trumps" when conflict exists regarding the qualifications of an occupation.  *Haddock*, 196 F.3d at 1091; SSR 00-4p at *2.  Nonetheless, before relying on VE testimony as substantial evidence to support a determination of non-disability, ALJs must address and resolve any apparent conflict between VE testimony and

information included in the DOT.  *See Haddock*, 196 F.3d at 1089–92 (holding when a conflict

arises between the DOT and the testimony of a VE, the ALJ "must investigate and elicit a

reasonable explanation for any conflict…before the ALJ may rely on the [VE's] testimony.");  *see*

*also* SSR 00-4p at *4 ("When a VE…provides evidence about the requirements of a job or

occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict

between that VE…evidence and information provided in the DOT.")

In the present case, the ALJ limited Mr. Anders's visual capabilities to "no far acuity" and

"no more than frequent" near acuity vision.  (Tr. 20–21.)  The VE considered these and other

limitations and determined that Mr. Anders could perform other work that exists in the national

economy including the three occupations of:  gluer, cleaner and polisher, and inspector/hand

packager.  (Tr. 29–30, 69–70.)  The ALJ accepted the VE's testimony and concluded that Mr.

Anders could perform all three VE-identified jobs.  (Tr. 29–30.)

Mr. Anders concedes that the jobs of gluer and inspector/hand packager require frequent

near acuity and do not require far acuity, consistent with Mr. Anders's visual capabilities.  (Pl.'s

Reply Br. 2, ECF No. 29 (citing Ex. 1, pgs. 4, 11)); (DOT code 795.687-014 (gluer job

description)); (DOT code 559.687-074 (inspector and hand packager job description)).  In contrast,

the DOT requirements for the job of cleaner/hand polisher include constant near acuity vision.

(DOT code 709.687-010, 1991 WL 679134 (cleaner/polisher job description)).  The occupational

function requirement of constant near acuity exceeds Mr. Anders's limitation to "no more than

frequent" near acuity vision.  (Tr. 20–21.)  The Commissioner concedes the ALJ did not obtain a

reasonable explanation from the VE regarding such apparent conflict, in violation of *Haddock* and

SSR 00-4p.  (Def.'s Answer Br. 8, ECF No. 28; tr. 69–72.)  Thus, the Court agrees that the ALJ

erred in finding Mr. Anders could perform the job of cleaner and polisher.  Therefore, the Court

disregards this job as one Mr. Anders could perform for the balance of the analysis.

2.  *Educational Requirements*

Mr. Anders argues that the ALJ also erred by relying on VE testimony to support the

conclusion that he can work as an inspector/hand packager.  (Pl.'s Opening Br. 15, ECF No. 19.)

Specifically, Mr. Anders argues that the VE's testimony deviated from the DOT regarding the

educational requirements for the job of inspector/hand packager.  (Pl.'s Opening Br. 15–16, ECF

No. 19.)  Thus, Mr. Anders contends, "[n]o substantial evidence exists for the proposition that

Mark Anders could meet the education requirements of a high school education for the

occupations of cleaner and polisher or inspector and hand packager as described by the

OOH [*Occupational Outlook Handbook*] and the O\*Net [*Occupational Information Network*]."

(Pl's Reply Br. 11, ECF No. 29.)  The Court disagrees.

In making a disability determination, the SSA relies "primarily on the DOT (including its

companion publication, the SCO) for information about the requirements of work in the national

economy."  SSR 00-4p at \*2.  20 C.F.R. § 404.1566(d) provides five sources of reliable job

information from various governmental and other publications, including the DOT.  The DOT uses

General Education Development ("GED") levels for math, language, and reasoning to describe the

educational background needed to perform each occupation satisfactorily.  *Anderson v. Colvin*, 514

F. App'x 756, 764 (10th Cir. 2013) (unpublished) (recognizing that GED levels equate to general

educational background that makes an individual suitable for a job); Mounts *v. Astrue*, 479 F.

App'x 860, 868 (10th Cir. 2012) (unpublished) (same).  GED levels rate reasoning ability from

Level 1 (requiring least amount of reasoning ability) to Level 6 (requiring highest level of

reasoning ability).  *Anderson*, 514 F. App'x at 764.

Here, the ALJ determined that Mr. Anders had an eleventh grade education and the ability to communicate in English, which equates with a limited education finding.  (Tr. 29; 20 C.F.R. § 404.1564.)  The ALJ limited Mr. Anders to GED levels of three in reasoning, two in math, and two in language.  (Tr. 20–21.)  The VE considered these educational and other limitations and determined that Mr. Anders could perform other work in the economy including the unskilled light work of gluer and inspector/hand packager.  (Tr. 29–30.)

The DOT's educational requirements for the job of inspector and packager include GED levels of two in reasoning, two in language, and one in math.  (DOT 559.687-074, 1991 WL 683797 (inspector and hand packager job description)).  The DOT's educational requirements for the job of gluer include GED levels of one in reasoning, one in math, and one in language.  (DOT 795.687-014, 1991 WL 681336 (gluer job description)).  Both occupations also require a specific vocational preparation ("SVP") level of two, corresponding to unskilled work.  *See* SSR 00-4p at *3 (stating an SVP of two corresponds with unskilled work).  Because Mr. Anders's educational limitations remain consistent with the required GED levels outlined in the DOT for occupations of both gluer and inspector and packager, the Court finds substantial evidence supports the ALJ's findings on this point.

Nothing in Tenth Circuit case law or SSR 00-4p requires an ALJ to explain any conflict between VE testimony and information in the O*Net or OOH, where the VE testimony does not conflict with information included in the DOT.  Further, the Regulations do not recognize the O*Net as one of the DOT's companion sources of administrative notice.  20 C.F.R. § 404.1566(d); 20 C.F.R. Part 202, Subpart P, App. 2, § 200.00(b); SSR 00-4p at *2.  Further, in response to the question of "whether the O*NET could take the DOT's place in the disability adjudication process", the SSA has responded in the negative.  *See* Soc. Sec. Admin., *OIS Project Frequently*

*Asked Questions*: *Why are you developing a new occupational information system (OIS)?  Why can't the Department of Labor (DOL) update the Dictionary of Occupational Tiles (DOT), or why can't you use the Occupational Information Network (O*NET)* (September 16, 2015, 09:22 AM), *available at* http://www.ssa.gov/disabilityresearch/ois_project_faqs.html (noting the O*Net "does not describe the physical requirements of occupations at the level of detail needed for claims adjudication.")

Because the DOT supports the VE testimony, and the ALJ relied on the VE testimony, substantial evidence supports the ALJ's findings on this point.

*3.  Lifting and Carrying Requirements of Light Work*

Mr. Anders argues that substantial evidence does not support the ALJ's finding that Mr. Anders could perform the lifting and carrying requirements of light work, and instead asserts that the ALJ's RFC determination limits Mr. Anders to sedentary work.  (Pl.'s Opening Br. 17–19, ECF No. 19.)  Specifically, Mr. Anders argues that the ALJ failed to "adduce a persuasive basis for deviating from the requirements of light work as described by the DOT."  (Pl's Opening Br. 16, ECF No. 19.)  The Court disagrees.

Social Security Ruling ("SSR") 83-10 clarifies the SSA's policy for using the Grids in determining a claimant's ability to perform other work.  SSR 83-10, 1983 WL 31251, *1 (Jan. 1, 1983).  Specifically, SSR 83-10 contains "elaborations of the activities needed to carry out the requirements of sedentary, light, and medium work."  *Id.* at *5.

The Regulation states:

> "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.   Jobs are sedentary if walking and standing are required

occasionally and other sedentary criteria are met."

20 C.F.R. § 404.1567(a).  By contrast,

> "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when   it requires a good deal of walking or standing or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."

*Id*.  To perform the full range of light work, an individual "must have the ability to do substantially all of these activities."  *Id*.

Here, the ALJ concluded that Mr. Anders had the physical ability to do a reduced range of unskilled light work.  (Tr. 20-21.)  The DOT does not address situations where an individual has a more limited range of work but instead "lists maximum requirements for occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings." SSR 00-4p at *3.  Nonetheless, a claimant's inability to perform the full range of light work does not mean that he can only perform sedentary work or is precluded from all activity.

When a claimant's ability falls between two ranges of work, the SSA recommends ALJs consult a VE to determine how the claimant's limitations affect whether the claimant can perform other work that exists in the economy and how many such jobs exist.  SSR 83-12, 1983 WL 31253 at *2–3 (noting where an individual's limitations fall somewhere "in the middle" of the ranges, the SSA recommends consulting a VE).  Here, the ALJ limited Mr. Anders to lifting no more than eight and a half pounds at a time and standing or walking for a combined total of six hours in an eight-hour day but no more than fifteen minutes at a time with the option to use a cane.  (Tr. 20.) Given the possibility that Mr. Anders could only perform a reduced range of light work, the ALJ consulted a VE.  (Tr. 69–76.)

Mr. Anders contends that his inability to perform work that requires lifting over eight and a half pounds conflicts with the work of gluer and inspector/hand packager, which require lifting up to twenty pounds sometimes and ten pounds frequently, and thus reflects a limitation to sedentary work.  (Pl.'s Reply Br. 6, ECF No. 29.)  While light work may include frequent lifting or carrying of ten pound objects and a "good deal" of walking, standing, and sitting, sedentary work involves lifting up to ten pounds at a time and the occasional lifting or carrying of smaller items as well as sitting, walking, and standing.  SSR 83-10 at *5.

The ALJ specifically inquired of the VE whether the DOT and SCO provide any detail provided in his RFC hypothetical, specifically, the "sit/stand option and the other limitations."  (Tr. 71.)  The VE responded no and testified she reduced the numbers of jobs available based on her "experience and study of the jobs."  (*Id*.)  Additionally, Mr. Anders's counsel asked the VE about the impact that the ALJ's hypothetical limitations, specifically the "sit/stand" option and "the lifting limitation being in a range not occasionally ten pounds but between eight and a half and ten pounds, variable on the day," on Mr. Anders's ability to perform the full range of sedentary work.  (Tr. 73.)  The VE testified that the ALJ's hypothetical limitations "taken in the aggregate" would have "significant erosion" on Mr. Anders's ability to perform a wide range of both unskilled light and sedentary work.  (Tr. 73–74.)  Nonetheless, the VE testified that despite this reduction in the occupational base, 30,000 jobs[4] existed in the national economy that someone with Mr. Anders's RFC could perform.  (Tr. 29–30, 70.)

The ALJ relied on the VE's testimony and found that Mr. Anders had the capability to perform some light jobs that exist in the national economy.  (Tr. 29–30.)  Because the ALJ relied upon the testimony, and the VE considered Mr. Anders's limitations in giving her opinion,

---

[4] The Court recognizes only 20,000 jobs would be available to Mr. Anders, given its previous finding.

substantial evidence supports the ALJ's finding that Mr. Anders has the exertional capacity to perform the light work of gluer and inspector/hand packager, despite his impairments.

### C.  Significant Job Numbers

Mr. Anders further asserts that the ALJ failed to meet his burden at step five to show that jobs Mr. Anders could perform existed in significant numbers in the national economy. Specifically, Mr. Anders argues, the ALJ erred by accepting the VE's testimony as substantial evidence to support a finding of non-disability where VE testimony about the number of available jobs "deviated from the sources of administrative notice without explanation, reasonable or otherwise."  (Pl.'s Reply Br. 2, ECF No. 29.)  The Court disagrees.

To satisfy the ALJ's burden at step five, substantial evidence must support that a significant number of jobs exist in the national economy that the claimant can perform.  *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989).  ALJs may consult occupational information from reliable sources other than the DOT, including VE job placement experience.  *See Haddock*, 196 F.3d at 1089. Nonetheless, VEs must explain any discrepancy between their testimony and information included in the DOT.  *Id.* at 1087.

Here, the VE testified that the hypothetical individual matching Mr. Anders's RFC could perform several unskilled light jobs listed in the DOT including gluer (DOT 795.687-014) and cleaner/hand polisher (DOT 709.687-010).  (Tr. 70.)  The ALJ asked the VE whether the DOT and SCO addressed the limitations included in his RFC hypothetical.  (Tr. 71.)  The VE responded no. (*Id.*)  The VE testified she relied on her professional experience and other government publications to testify about the impact of the ALJ's limitations on the occupational base.  (Tr. 71–72.)

The VE based her job numbers primarily on two sources:  (1) the VE's own professional experience and "study of the jobs", (tr. 71), and (2) formal quantitative data, including the DOL

21

publication, the *Occupational Employment Statistics Survey* ("OES"), and the U.S. Publishing

publication, the *Occupational Employment Quarterly* ("OEQ").  (Tr. 71–72, 74–75.)  "The OES

survey is a federal-state cooperative program between the Bureau of Labor Statistics (BLS) and the

State Workforce Agencies (SWAs)" that provides national "[o]ccupational employment and wage

rate estimates"  U.S. DOL, BLS, *Occupational Employment Statistics: Overview* (Sept. 15, 2015,

11:33 AM), *available at* http://www.bls.gov/oes/oes_emp.htm.  The OES provides a reliable

source of occupation data for use in various circumstances including, but not limited to:

vocational counseling and planning, analysis of occupational employment, and development of

occupational projections.  *Id*.  Similarly, the OEQ provides a reliable source of occupational data

derived from governmental sources including the DOL through the BLS and the U.S. Department

of Commerce through the Census Bureau.  U.S. Publishing, Occupational Statistics, *Data Source

References* (Sept. 18, 2015, 3:30 PM)*, available at* http://www.uspublishing.net/references.html.

OEQ data is "intended to be used in conjunction with local labor market expertise and research."

*Id*.  None of these publications provides DOT-specific job numbers.  (Tr. 75.)

      The Tenth Circuit has held that VE testimony based on a VE's professional experience

provides a sufficiently reasonable explanation for any apparent conflict between the DOT and VE

testimony in regards to a job's exertional requirements.  *Rogers v. Astrue*, 312 F. App'x 138, 141-

42 (10th Cir. 2009) (citing 20 C.F.R. §§ 404.1566(d), (e), 404.1567(a)).  Thus, an ALJ may rely on

the VE's professional experience as substantial evidence to support a determination of non-

disability.  *Id*.  Similarly, the Ninth Circuit has held that "[a] VE's recognized expertise provides

the necessary foundation for his or her testimony," and "no additional foundation is required."

*Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005).

The Tenth "Circuit has never drawn a bright line establishing the number of jobs necessary to constitute a 'significant number.'" *Trimiar*, 966 F.2d at 1330.  Instead, the Tenth Circuit relies on "the [ALJ's] common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Id*.  However, the Tenth Circuit has held that 11,000 jobs in the national economy constitute substantial evidence to support a determination of non-disability. *Rogers*, 312 F. App'x at 142.

Mr. Anders had the right to cross-examine the VE fully on any pertinent issue within the VE's area of expertise. *Haddock*, 196 F.3d at 1090 (citing *Glass v. Shalala*, 43 F.3d 1392, 1396 (10th Cir. 1994)).  Here, Mr. Anders's counsel asked VE about the number of jobs available to Mr. Anders in the national economy and the occupational data sources that informed her jobs numbers testimony.  (Tr. 73–75.)  In particular, Mr. Anders's counsel asked the VE whether she had consulted *Job Browser Pro* for her job numbers testimony for the identified occupations.  (Tr. 75.) The VE responded in the affirmative.  (*Id*.)  The VE testified that she used Job Browser Pro as a resource and that this publication reported numbers specific to the DOT job descriptions.  (*Id*.) However, the VE testified that *Job Browser Pro* primarily uses OES as its basis for job numbers information.  (*Id*.)  Thus, the VE testified that although she primarily relied on the OES for her job numbers testimony and considers the OES the most "trustworthy" publication, she also consulted job information from the OEQ to "balance things out."  (*Id.*)

The Court concludes that substantial evidence supports the ALJ's finding that a significant number of jobs exist in the national economy that Mr. Anders could perform given his limitations based on the VE's professional experience and governmental publications.

## V. CONCLUSION

Based on the foregoing, the Court finds that substantial evidence supports the Commissioner's decision and that the Commissioner followed the law.  Therefore, the Court AFFIRMS the Commissioner's decision denying Mr. Anders's claim for disability benefits in this case.

DATED this 18th day of September, 2015.

BY THE COURT:

Evelyn J. Furse
United States Magistrate Judge